## WHEELER N. FRENCH v. HENRY F. TESCHEMAKER, A. H. TITCOMB, MYLES D. SWEENY, H. DE LA MONTANYA, H. L. KING, DOMINICK GAVEN, W. C. HINCKLEY, G. W. BELL, JOHN C. MERRILL, JOHN H. REDINGTON, FRANK McCOPPIN, AND J. W. CUDWORTH.

CONSTRUCTION OF CONSTITUTION.—Constitutions, like statutes and private instruments, must be so construed, if possible, as to give some force and effect to each of their provisions.

STOCKHOLDERS OF CORPORATIONS—PERSONAL LIABILITY OF.—Section thirty-six of Article IV of the Constitution, relating to the liability of the stockholders of corporations for corporate debts, is not self-executing, nor does it contain within its own terms a rule of conduct broad enough to embrace and definitely settle every question that may arise touching the individual and personal liability which it imposes upon the stockholders.

SAME.—Legislation is necessary to give practical effect to said clause in the Constitution, and without the aid of legislation it is inoperative.

SAME—POWER OF LEGISLATURE.—The Legislature has the power to say, not that the stockholder shall not be liable for any of the debts of the corporation, but that he shall be liable for his portion, and what that portion shall be.

SAME.—The Legislature must also impose the same rate of liability upon all stockholders, and the law must operate alike upon all corporations.

CORPORATIONS—POWER OF LEGISLATURE.—An Act of the Legislature authorizing the formation of corporations, without attaching to the stockholders an individual liability, would be unconstitutional, and the persons organized under such an Act would acquire none of the rights of a corporation.

French *v.* Teschemaker *et als.*

STATUTE—PART UNCONSTITUTIONAL.—A provision or section of an Act which is unconstitutional, but independent, and does not enter into the general object and purpose of the Act, and may be stricken out without prejudice to the general intent and design of the Act, does not vitiate those portions of the Act which *are* constitutional.

MUNICIPAL CORPORATIONS—POWER TO SUBSCRIBE STOCK.—Municipal corporations have no power to subscribe to the stock of private corporations without being authorized so to do by the Legislature.

SAME—HOW MADE.—When such power is given by legislative enactment, the subscription must be made in the mode and manner and upon the conditions prescribed in the Act.

SAN FRANCISCO—SUBSCRIPTION OF STOCK TO CENTRAL PACIFIC R. R. COMPANY.— The seventeenth section of an Act entitled "An Act to authorize the Board of Supervisors of the City and County of San Francisco to take and subscribe one million dollars to the capital stock of the Western Pacific Railroad Company and the Central Pacific Railroad Company of California, and to provide for the payment of the same, and other matters relating thereto," approved April 22d, 1863, is not an independent provision which could be left out without doing violence to the intent of the Legislature in passing the Act.

CONSTRUCTION OF STATUTES.—When an Act of the Legislature is ambiguous upon its face, and susceptible of different constructions, such construction as would declare it unconstitutional should be avoided when it can be fairly done.

SAME—VIEWS OF ELECTORS VOTING ON.—The intent or proper construction of an Act of the Legislature which took effect upon the contingency of receiving a majority of the votes of the electors of a municipal corporation, is not to be determined by the views entertained of its provisions by the electors when they adopted it.

WAIVER OF PERSONAL LIABILITY OF STOCKHOLDERS.—An Act of the Legislature authorizing a municipal corporation to subscribe for stock of a railroad company, the subscription to be made upon the condition that the municipal corporation shall not be liable for the debts of the company, and that the provision as to said liability be made a part of and be stipulated in all contracts made by the railroad company for the construction and equipment of its road, does not exempt the municipal corporation from liability for the debts of the railroad company further than such exemption can be secured by persons contracting with the railroad company expressly stipulating in their contracts to waive all claims against the municipal body for payment of the debt.

SAME—BY CONTRACT.—Persons contracting with a corporation may insert a stipulation in the contract waiving the right to hold the stockholders of the coporation liable for a debt or liability of the corporation created thereby, and such stipulation is not unconstitutional, but may be enforced.

SAME.—Corporations, by inserting such stipulations in all contracts whereby corporate debts are created, may effectually guard stockholders from all liability for the debts of the corporation.

APPEAL from the Twelfth Judicial District, City and County of San Francisco.

April 22d, 1863, the Legislature of this State passed an Act to authorize the Board of Supervisors of the City and County

of San Francisco to take and subscribe one million of dollars to the capital stock of the Western Pacific Railroad Company, and the Central Pacific Railroad Company of California.

The first section of the Act provided that on the third Tuesday in May, 1863, a special election should be held in the City and County of San Francisco, for the purpose of submitting to the qualified electors of said city and county the proposition for said subscription, and that if the majority of the electors voted for the subscription, then, when the result of the election was declared, the Board of Supervisors should immediately subscribe, in the name of the city and county, and for its use, benefit, and advantage, the sum authorized in the said Act.

The Act further provided that the subscription should be paid in the bonds of the city and county, and that as the payment to such subscription should be required to be made by the Board of Directors of each of the railroad companies, the Board of Supervisors should direct its President, and the Auditor and Treasurer of the city and county, to issue the bonds in sums of one thousand dollars each.

The election was held in pursuance of the law, and a majority of the electors voted in favor of the subscription.

The defendants constituted the Board of Supervisors of the City and County of San Francisco, and on the 23d of May, 1863, the plaintiff commenced this action.

The complaint averred that the plaintiff was an owner of real estate and personal property in the city and county, liable to taxation, and that he brought the action on his own behalf, and on behalf of all other tax payers in the city and county, and that the defendants were about to make the subscription as directed by the law, and order their President and the Auditor and Treasurer to issue bonds to the railroad companies to the amount directed by the law, and thus cause the city and county to become a stockholder in said railroad companies to that amount.

The complaint further averred that prior to the commencement of the action each of the railroad companies had con-

tracted debts and liabilities to a large amount, for which, if the subscription was made and the bonds were issued, the city and county would become liable in a larger amount than the proposed subscription; that the Act of the Legislature under which the Board of Supervisors proposed to subscribe was in conflict with and in violation of the provisions of the Constitution of the State of California, and therefore conferred no power or authority on the Board of Supervisors to make the subscription; that the seventeenth section of the Act expressed the conditions upon which the electors voted their assent to the subscription, and that it was unconstitutional, and could not be maintained, and it would operate as a fraud upon the electors and upon the city and county to allow the subscription to be made; that if the subscription was made and the bonds were issued, plaintiff and the other tax payers of San Francisco would be subjected to a large amount of increased taxation, etc.

A perpetual injunction was prayed for, prohibiting the Board of Supervisors from making the subscription, and from ordering the President of the Board and the Treasurer and Auditor to issue the bonds.

The Court below denied the injunction and gave judgment for defendants.   Plaintiff appealed.

*H. & C. McAllister*, and *Hoge & Wilson*, for Appellant.

Our sole point is, that the Act of April 22d, 1863, in authorizing the City and County of San Francisco to subscribe one million dollars to the capital stock of the Western Pacific Railroad Company and the Central Pacific Railroad Company of California, is unconstitutional and void.

Constitution of California, Art. IV, sec. 36 : " Each stockholder of a corporation or joint stock association shall be individually and personally liable for his proportion of all its debts and liabilities."

Respondents contend that sections thirty-two and thirty-six of Article IV of the Constitution are inoperative without legislation.

66

This may be true as to section thirty-two, but section thirty-six is all-sufficient for our purpose, and is *self-executing*. The stockholder is thereby liable for his proportion of all the debts and liabilities—that is, the amount of his liability is proportioned to the amount of his stock, and that liability is not satisfied by the whole value of the stock he holds, but may extend far beyond his interest in the stock of the corporation. The meaning of the Constitution is plain and palpable.

Debates in the Constitutional Convention of California, p. 136 : " The 36th section of the report of the committee being under consideration, as follows : ' 36. The stockholders of every corporation or joint stock association shall be individually responsible *to the amount of their respective share or shares of stock* in any such corporation or association for all its debts and liabilities of every kind ;' Mr. Jones moved to *strike out* the section and insert the following, which was *adopted*, viz : ' 36. Each stockholder of a corporation or joint stock association shall be individually and personally liable for his proportion of all its debts and liabilities.' "

The Constitution upon this question, to-wit : the liability of a corporator, is clear, explicit, and plenary—requiring no legislation to give it force and activity, but *self-operative*, and constituting *of itself* a practical law of corporate conduct and corporate responsibility.

An illustration of the *self-acting* power of the Constitution is to be found in Article XI, section fourteen :

" SEC. 14. All property, both real and personal, of the wife, owned or claimed by marriage, and that acquired afterwards by gift, devise, or descent, shall be her separate property, and laws shall be passed more clearly defining the rights of the wife, in relation as well to her separate property, as to that held in common with her husband. Laws shall also be passed providing for the registration of the wife's separate property."

*Selover* v. *American Russian Com. Co.*, 7 Cal. 266, syllabus: "The capacity of the wife to hold separate property is created

*by the Constitution,* and her title thereto depends upon the mode of acqusition, and vests before the inventory can be filed. * * * Mr. Justice Burnett: ' The counsel for the defendant assumes, substantially, that the capacity of the wife is created *by the statute,* and that she can only acquire that capacity by strictly complying with the provisions of the third, fourth, and fifth sections in the same way that a *feme sole* trader does, by complying with the statute creating that capacity. And he insists, that until the property is properly inventoried, it is not separate property within the meaning of the Act, and is subject to the disposition of the husband.' This position would seem to be incorrect. The capacity of the wife is created *by the Constitution,* and her title to her separate estate depends *alone* upon the *mode of its acquisition,* and vests in her before the inventory can be filed."

Whenever the organic law can execute its own provisions, there is no necessity of legislation ; neither should the whole operation of the Constitution be dependent upon the legislative will ; for a Constitution whose provisions are put into activity or made inoperative *by statute,* is no Constitution at all.

Besides, if this clause of the Constitution as to the liability of stockholders is, as claimed by respondents, a mere power conferred, to be executed by legislation, there has been a valid execution of the power; laws have been passed which impose the same liability upon the stockholder as that established by the Constitution, and those laws cannot be *so repealed* as to render this constitutional provision inoperative.

By Article IV, section thirty-six, Constitution, every stockholder of a corporation is explicitly liable "*for his proportion of all its debts and liabilities.*"

The Constitution imposing the liability, the statute seeking to release the liability, use the very same terms. The former establishes, the latter seeks to overthrow, to destroy the organic policy—to nullify the very language and letter of the Constitution.

Can there be a clearer, grosser violation of Constitutional

provisions? The exemption from liability is general—there is no limiting or qualifying language; it is made *the condition* of subscription; it is to be inserted as part and parcel of the subscription "on the books of each of said companies," and is to apply to all debts and liabilities. The words are: "*Upon the express condition that the said city and county shall not be liable for any of the debts and liabilities of either of said companies.*"

The subsequent provision, that this exemption shall be expressly stipulated for in all contracts for construction and equipment, is a mere additional precaution, suggested, doubtless, by the idea that the general exemption from liability might prove invalid, and in the vain belief that these contracts for equipment and construction would constitute the primary and principal liabilities of the corporations.

The comprehensive grasp of the Constitution embraces every form in which associated wealth secures to itself any of the powers or privileges of corporations not possessed by individuals or partnerships. The power to incorporate for banking purposes is taken away. Additional guards and restrictions are provided for, and then follow the provisions aimed at the great evil of the system, so much complained of, and leading to such disastrous consequences to the general public: "*Every stockholder of a corporation or joint stock association shall be individually and personally liable for his proportion of all its debts and liabilities.*" This is the great provision for the security of the public. It is inserted in pursuance of grand considerations of public policy for the guaranty and protection of great public interests and forms, with the other provisions alluded to—a harmonious whole, well calculated to promote the great object in view.

It is beyond the reach of legislative expediency. It cannot be avoided or defeated by any legislative arrangement or manœuvre. It enters into and becomes a part of the very meaning and essence of a corporation. There can be no such thing in this State as a corporation without it. The Constitution has made the principle enter into and become of the very nature of the corporation. To strike it out, to avoid it

by any indirection, to dispense with it upon any pretext, however plausible, is to destroy the very essence of the corporation itself. To create a corporation with freedom from this constitutional necessity, or to engraft it upon an existing one, is beyond the power of the Legislature.

While a common law policy may be modified or waived so far as the discretion and judgment of Courts may permit, a constitutional policy, when not a mere personal privilege, never can be.

The usages, customs, policy of the common law, may be swept away by statute, stipulated away by contract; but against constitutional language and policy all such attacks are futile. It is an instrument above public clamor, above legislation; and this Court has recently vindicated its invincibility against the strongest legislative, political, and public pressure.

*In Matter of Oliver Lee & Co.'s Bank,* 21 N. Y. 7 Smith, 11: Mr. Justice Denio: "The first question to be determined relates to the construction of the constitutional provision imposing personal liability upon the stockholders of banks (Const. Art. VIII, Sec. 7); and the inquiry is, whether it is limited to banks thereafter to be created, or applies equally to existing banking corporations. There is nothing in the language which looks to a discrimination between the two classes. It declares, generally, that the stockholders in every corporation and joint stock association for banking purposes issuing bank notes after January 1st, 1850, shall be individually responsible, etc. * * * It is argued that because the Act left it to the election of the stockholders to determine whether they would embark in the business upon the footing of personal liability, or upon that of corporate liability only, and they declared by the articles that they would not incur any individual responsibility, a private contract was established which was beyond the influence of the clause allowing a modification or repeal of the Act. It is not in the power of the associates, by any stipulations inserted in their articles of association, to limit the power of the Legislature under the reservation contained in the Act * * *. The power of the

corporation to contract at all was a corporate franchise, and subject to the control of the Legislature by force of the reservation."

*In Matter of Reciprocity Bank*, 22 New York, 8 Smith, 12: Mr. Chief Justice Comstock: "This Court has recently determined *in the matter of Oliver Lee & Company's Bank*, 21 N. Y. 9, that the free banking associations in this State, created before as well as after the Constitution of 1846 was adopted, are within the personal liability clause of that instrument, and also within the Act of April 6th, 1849, which was enacted to provide the means of enforcing such liability. * * * Proceeding now to such questions as affect the separate or particular interests of some of the appellants and not others, it appears that Mrs. Lansing, in 1840, while a *feme sole*, became the owner of some shares of the stock. She was married to Mr. Lansing in 1841, but the stock has stood in her name to the present time, and she has received the dividends thereon. It is insisted that she is not liable to be assessed in respect to this stock to pay the creditors of the bank. * * * It is said that Mrs. Lansing, being under the disabilities of coverture, could not make a transfer of her shares, and so avoid this liability, if she had wished to do so. This is a circumstance which might have been properly addressed to the legislative discretion, *if, indeed, the Legislature had any discretion under the injunction of the Constitution;* but it does not authorize the Courts to allow an exemption where neither the Constitution nor the law has declared any. It is also said, that *femes covert* are not liable to suit or judgment at the common law, and, in general, this is true. It is also true that the apportionment of liability amongst stockholders in banks, when duly confirmed, becomes a judgment against each stockholder, to be enforced by execution as in other cases. But it was competent for the Legislature to depart from the rules and analogies of the common law, and to make married women and their estates liable in this proceeding as other shareholders in banks are made liable. This, we think, has been done, and it seems to us proper to add, that we see no reason why it ought not to be done, in order to effectuate

*the policy* in which the constitutional provision and the statute are founded. It might go far to defeat that policy, if married women could take and hold stock without liability to the creditors."

If the provisions of this statute of April 22d, 1863, exempting San Francisco from liability as a stockholder, are unconstitutional and inoperative, then the proposed subscription must fail ; for these provisions are intimately connected with the whole subject matter of the statute, are prominent considerations to the passage of the Act, and also to the assent to subscribe, and constitute the terms and conditions upon which the subscription is to be made and the stock is always to be held.

The statute has but one subject matter, to wit: the subscription by San Francisco of one million of dollars.

The seventeenth section is of the essence and pith of the statute. Note its emphatic expressions, and observe, also, that it contains strong language, not found in the statute, as to the Sacramento subscription passed upon in *Robinson* v. *Bidwell* —such as, that the subscriptions are to be made " *on the books of each of said companies,*" and that " *the said City and County shall never make any other or further subscription to the capital stock of said companies, or either of them, than that provided for by this Act.*"

The conditions of subscription set forth in the seventeenth section are clearly and emphatically expressed ; they are to be embodied in the very terms of subscription, " *on the books of each of said companies,*" in the primary and principal obligation of the municipality, the act of subscription, to which the bonds are but of subordinate importance.

The power of subscription is coupled with these express conditions of the seventeenth section ; the proposition submitted by the Legislature to the electors is a proposition of which these conditions are part and parcel ; the vote taken, the assent given, has been *upon the faith* of this restricted liability—this complete exemption from corporate responsibilities ; the municipal act which executes this huge mortgage is

to embody them; the construction and equipment contracts of the companies are to express them; whether or not expressed therein, these exempting conditions "*shall be a part*" of such contracts; and, under all circumstances and contingencies, "*the said City and County shall not be liable for any of the debts or liabilities of either of said companies beyond the amount so subscribed.*"

Mr. Justice Norton observes, in his second opinion in *Robinson* v. *Bidwell*, of a similar section of the Sacramento law : "*The purpose of that section is only to add a certain incident and effect to the act of becoming a stockholder.*"

An incident signifies "something beside the main design." Can it be said that these terms and conditions were beside the main design?

They were manifestly and prominently in the mind of the Legislature; without doubt, constituted important inducements and considerations to the passage of the Act; are fully and clearly set forth therein; are made the express conditions of the whole subscription; are obviously serious and substantial parts of this statute. Can they with justice be called mere incidents, immaterial additions?

Though the last words of the statute, they should lose no importance from that fact, but rather receive, by the usual rules of construction, especial weight.

"If a proviso in a statute be directly contrary to the purview of the statute, the proviso is good, and not the purview, because it speaks the later intention of the legislators." (*Attorney-General* v. *Governors Chelsea, etc.*, Fitzgibbon, 195, cited 9 Bacon Abridg. 243.)

"The proviso is generally intended to restrain the enacting clause, and to except something which would otherwise have been within it, or in some measure to modify the enacting clause." (*Wayman* v. *Southard*, 10 Wheat. 30.)

There is no law granting the power of subscription to a municipal corporation, where so important a part, so much of *the essence* of the whole legislative scheme, has been invalidated as is this case, that has been allowed to stand.

Are all the burdens of the statute to be enforced, and all its benefits annulled ?     A huge mortgage of one million of dollars to be fastened upon the homesteads of San Francisco for thirty years to come, and longer if not then paid, with all the onerous provisions of the mortgage binding and operative, and all the alleviating and compensatory conditions invalid and of none effect ?

The Legislature evidently thought—must be presumed to have thought—these *express conditions* constitutional, valid, and susceptible of practical operation.     It will hardly be supposed that the Legislature intended a fraud upon the voters of San Francisco, and inserted these ameliorating conditions and exemptions as a delusive deceit.     If, then, the Judicial Department adjudicates them unconstitutional and invalid, shall the subscriptions still be enforced ?

They are terms of no unimportant character, but of vital benefit.     Terms which might, could they be effectuated, protect our metropolis from future bankruptcy ; which any business man would eagerly grasp ; which, could they be applied to all corporations in this State, would largely increase the number of such organizations.

There can be no exaggeration of the plain and palpable injustice of *compelling* the subscription under such circumstances.     It is as if a deed and defeasance, constituting but one transaction, are *so* enforced that the defeasance is annulled and the deed is construed as an absolute conveyance.

Neither should *the rights of the minority of the electors* be lost sight of in this case.     (*Foster* v. *The City of Kenosha*, 12 Wis. 622.)     One of the great advantages and blessings of a written constitution above all others is that *the minority* can invoke its protection against the demands and oppression of a violent majority."

The evidence shows a large minority (perhaps representing the greater property interest) opposed to this subscription. Their interests are entitled to the protection of the Constitution ; and that protection they have a right to invoke.     If they are to be subjected to taxation to meet and defray the liabilities

67

imposed upon them by the majority, they have at least the right to demand that this should be effected according to the principles of the Constitution, and the *whole mandates* of the law which that majority sets in operation against them.

The majority cannot be permitted to waive or avoid constitutional protections *for the minority;* nor can the Legislature authorize a majority to sacrifice the rights or interests of a minority upon any pretext whatever.

This is one answer to the argument that the electors must be presumed to have known the law unconstitutional when they voted for it.

Only the majority voted for it; they could not *accept* an unconstitutional law for the minority.

The true view, however, is, that the law was constitutional or unconstitutional at *the moment* of its passage; and that its character *in that respect* was not and could not be affected by the vote of the people.

*Pixley, Smith, & Hale,* for Respondent.

Section thirty-two is neither repealed nor qualified by the subsequent section, thirty-six. They both stand as if in a single section, jointly expressive of a single principle. Taken separately, and without legislation, they are both defective and inoperative.

The very language used points to the necessity of legislation, and not legislation to carry out a specific law in a certain manner, but broadly empowers the Legislature to pass laws " for the securing of dues from corporations," " by individual liability or *other· means.*" Had the intention of the Constitution been merely to make corporators irrevocably liable to the extent of their corporate interests without further legislation, then the language of the Constitution would have been definite· and certain; and without providing for securing the same by " *other means,* as may be prescribed by law," would have fixed the same upon the individual responsibility of its stockholders, and thus cut off legislative interference: whereas, the Legislature has been by this section,

not prohibited the use of, but clothed with power somewhat discretionary to pass such laws as will effect the " collection of dues from corporations," *that* being the gist of the section, and not the mere holding of stockholders individually responsible.

The statute of April 22d, 1864, is perfect without section seventeen, and the unconstitutionality of that section does not invalidate the Act.

This section is not the essence of the Act.    Take it away, and the Act in all its parts remains perfect and unimpaired. Without it, the meaning of the Act is still full, definite, certain, and without vagueness.

We suppose the principle is now well settled that where a statute has been passed by the Legislature under all the forms and sanctions requisite to the making of laws some part of which is not within the competency of legislative power, or is repugnant to any provisions of the Constitution, such part thereof will be adjudged void and of no avail, whilst all other parts of this Act not obnoxious to the same objection will be held valid, and have the force of law. (*Commonwealth* v. *Kimball*, 24 Pick. 359; *Fisher* v. *McGirr et al.* 1 Gray, 21.)

If the main objects and purposes of the Act are constitutional, *they* may be carried into effect, although there may be isolated clauses or separate or independent enactments obnoxious to the charge of being in violation of the Constitution. (*Warren* v. *Mayor of Charlestown*, 2 Gray, 97.)

But why search for authorities in Massachusetts, Ohio, or New York, when our own Courts have repeatedly and emphatically decided the very point here at issue?

In the case of *Guy* v. *Hermance*, 5 Cal. 74, the Court say : " That portion of the Act of 1853, entitled ' An Act to provide for the sale of the interest of the State of California in the property within the water line,' etc., which prescribes that no injunction shall be issued against the Commissioners, is invalid."

The seventeenth section of this statute does not, in either its language or meaning, deprive or take away the rights of any

individuals—it interferes with no existing contracts, lessens no remedy, and infringes upon no privilege of either life or property.

The intention of the Legislature was simply to create a condition upon which, in the giving out of *certain contracts*, parties desiring to take them may, by a voluntary act of their own, *stipulate in writing* to waive all personal claim against the City and County of San Francisco in the event of default of payment.

It was clearly not the design of our Legislature to pass an Act that should be unconstitutional in one of its provisions, even though an immaterial one, for after enacting that the city and county " shall not be liable for any of the debts or liabilities of either of said companies beyond the amount so subscribed," immediately and in the same section qualifies the general language by the subsequent provision, thus : " and this provision as to the liability of said city and county shall be a part of, and so expressly stipulated, in all contracts made by said companies for the construction and equipment of said roads."   Then the penalty is prescribed, in the event " said companies shall fail or refuse to make such stipulation in all of their said contracts," etc.

Now, had the Legislature intended the first sentence of section seventeen to be interpreted independent of the subsequent parts of the same section, and as including liabilities of all and every character, why specially provide for stipulations in *contracts*, and not in bonds, agreements, and notes, etc., or is the term " contract " sufficiently comprehensive to embrace all liabilities that can be incurred ?

Therefore, the most natural and rational construction is, that the Legislature, deeming it competent for parties to waive, *by voluntary act*, their constitutional right in the premises, provided by section seventeen that the companies shall contract (where contracts are necessary) with only such parties as are willing, by their *written consent*, to so release the City and County of San Francisco.

In *this* construction there can be no constitutional objection ;

which mere fact is of itself sufficient to recommend it to the mind of the Court; for where a statute can be so construed as to render it free from constitutional objection, it is the duty of the Court to give it such construction.

Unless the first sentence of section seventeen is sufficient of itself to exempt the city and county, (and if so, then the section should have stopped there,) and the Courts will hold the residue of the section with its penalty clause to be mere surplusage; in which event every agreement or obligation of the companies, every charge or liability, whether contingent or certain, written or parol, executory or executed, it must be assumed (*in defiance of the Statute of Frauds*, and of every hitherto established principle of law) exists by virtue of the law, independent of any personal claim, on the city and county, and the force of which enactment, by its own inherent power, is sufficient to create that exemption without regard to the consent of the contracting parties; and this is too monstrous a proposition for even illustrative use, otherwise *contracts* would be inevitable with every clerk, engineer, fireman, and laborer—for every nail, bolt, bar, or pound of coal bought—with every passenger, and consignor of freight, with every cattle owner in the county, and every inhabitant of the State, who might possibly be run over; for without any regard to the amount involved or the time of performance, *every such contract, being in fact a promise by certain of the stockholders to answer for the debt or default of a certain other stockholder*, (unless the first sentence of section seventeen repeals the Statute of Frauds, and all other conflicting laws,) *must be in writing, and for a consideration, to be of any valid effect.*

If it be not such agreement on the part of the stockholders, it must be an agreement *by* the contractors or creditors, whereby they covenant, in default of payment, to release such proportion of the companies' liabilities as the stock owned by the City and County of San Francisco bears to the whole; but even then an agreement in writing and for a consideration would be necessary. In short, take any view of the

meaning of the Legislature besides the one advanced, and the amount of writing and time necessary to carry into *practical* effect its provisions would be so to hinder and clog their business as to make the intended benefit to these companies burdensome and insupportable.

It is perhaps not essential to discuss in this form of action, whether it is competent or not for contractors or creditors to waive a constitutional right; yet as we desire to dispose fully of all the issues raised, we ask the indulgence of the Court for a brief space.

Admitting the provisions of the Constitution to be in full force without legislation, then it is in force as to the creditors of the company, and they may at their own volition waive that right; in fact, the question of waiving a constitutional right has been affirmatively determined repeatedly in America. In the case of *Lee* v. *Tillotson*, 24 Wend. 338, as to the right of trial by jury, Judge Cowen held that " the objection called for the less countenance in this case, inasmuch as the parties mutually consented to the reference by writing. This of itself is a waiver of the objection, even if the Constitution stood in the way. A party may waive a constitutional as well as a statute provision made for his own benefit. The contrary argument would deprive a criminal of the power to plead guilty."

Again : as to the waiver of the right of trial by jury, in *People* v. *Murray*, 5 Hill, 472, Mr. Chief Justice Nelson held that " the defendants took the grant to build the dam, with the condition attached to it, and they are not now at liberty to make the objection, though under other circumstances it might have been effected. It was competent for them to waive the right of a trial according to the common law, even if without such a waiver they would be considered entitled to it."

As to the laying out of roads, in *Baker* v. *Braman*, 6 Hill, 48, and which principles were subsequently sustained in the Court of Appeals in *Embury* v. *Conner*, 3 Com. 518, Judge Cowen says : " In the light of the Constitution, if not that of a law which lies at the foundation of all governments, this

statute must be read with the proviso that the owner consent. That consent removes all obstacles, and lets the statute in to operate the same as if it had in terms contained the condition."

In the case referred to above of *Embury* v. *Conner*, 3 Com. 518, the Court say : " But it is insisted that, as the enactment is only held to be void on the ground that it takes private property for private uses against the owner's consent, if the consent be given, all objection on the ground of unconstitutionality is removed.    The decisions to which I have referred proceed upon that principle ; and Mr. Justice Bronson, in *Taylor* v. *Porter*, in terms concedes that the objection has no application when the owner consents.    If we read the statute in question with a proviso that the owner consent, and I think we should, that consent removes all obstacles and lets the statute in to operate, the same as if it had in terms contained the condition."

Through an entire course of English authorities the doctrine is sustained that parties may waive their statutory rights, provided it is done by *consent.*

We refer the Court to *Hallett* v. *Dowdall*, 9 Eng. Law and Eq., 347 ; 4 Exchequer, 324.

Mr. Sedgwick, in his able treatise on statutory and constitutional law says, at page 111 : " The general rule holds good as well in regard to Constitutions as to statutes—a party may waive a constitutional as well as a statutory provision made for his benefit."

It must also be borne in mind that the cases of *Wilson* v. *Pollock*, 2 Cal. 94, and *Exline* v. *Smith*, 5 Cal. 112, turned on the *absence of consent* to the waiver of a constitutional right, and not to the waiver itself, which the Court in both cases held would have been good if *consented* to, and to which cases, as authorities for respondent, we respectfully refer the Court.

*Patterson, Wallace & Stow*, also for Respondents.

" Where a provision in a statute is of such a nature and has such a connection with the other parts of the statute as to be

essential to the law, its unconstitutionality vitiates the whole enactment. But if an independent provision, not in its nature and connection essential to the other parts of the statute, be unconstitutional, it may be treated as a nullity, leaving the rest of the enactment to stand as valid." (3 Ohio State R. 34.)

To the same effect are: 11 Indiana, 424, 482; 1 Gray, Mass. 1; 2 Id. 84; 5 Id. 100; *People* v. *Hill*, 7 Cal. 97; 19 Illinois, 376: *Mills* v. *Lathrop*, 19 Cal. 513.

Section thirty-seven, Article IV of the Constitution, provides: "It shall be the duty of the Legislature to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations."

Now, by the Act under consideration the Legislature authorizes the city and county to contract a liability to a certain amount and no other. It has no power by its charter as a municipal government to become a stockholder at all; the power given by the Act is a restricted power, and cannot be exceeded. The city and county does not voluntarily propose to exceed it. The railroad corporations do not ask that it shall be exceeded. The plaintiff does not show it will be exceeded, but contends it possibly may be.

The city and county cannot become liable on an implied obligation against the express stipulation of her contract and against the restriction imposed by the Act. (*New York F. Ins. Co.* v. *Ely*, 5 Conn. 572; *Head* v. *Providence I. Co.*, 2 Cranch, 127; *Goszler* v. *Georgetown*, 6 Wheaton, 597.)

The position of the city and county is like the case of an infant who subscribed to stock; like that of a married woman under disability; like that of a lunatic.

The claim that section seventeen is unconstitutional ought to be considered determined by reference to section eighteen, page three hundred, of the Session Laws of 1857. "Neither the said Board, etc.,   *   *   *   shall in any event be liable for the debts of said railroad company in any amount beyond

the subscription made as herein provided;" and the case of *Pattison* v. *Board of Supervisors of Yuba County*, 13 Cal. 175, where the question was raised upon the constitutionality of the whole Act (p. 182,) and the case of *Robinson* v. *Bidwell et al.*, 23 Cal. 379.

*E. B. Crocker*, for Respondents.

Corporations have a clear and undoubted right, under the Constitution, to thus limit the liability of their stockholders by express stipulations to that effect in their contracts. A creditor of the corporation, by entering into such a contract, expressly waives the benefit of the constitutional provision relating to the liability of the stockholders of a corporation. Section thirty-six of the Constitution, above cited, was intended for the benefit of the creditors of the corporation. Its most enlarged construction is to confer upon the creditor a right which did not exist at common law—that is, a right to resort to the individual and personal responsibility of the stockholders. But the Constitution does not compel the creditor to accept this benefit, or prohibit him from waiving it. It is clearly to be classed among those rights which he may *waive* by agreement, and he will be held bound by an agreement to that effect, for a person may waive a constitutional as well as a statutory provision made for his benefit. (Sedgwick on Stat. and Const. Law, 111 ; *People* v. *Murray*, 5 Hill, 472 ; 3 Comstock, 518 ; 24 Wend. 337.)

By the Court, SANDERSON, C. J.

The only question presented for our consideration in this case relates to the constitutionality of an Act passed by the Legislature in 1863, entitled " An Act to authorize the Board of Supervisors of the City and County of San Francisco to take and subscribe one million dollars to the capital stock of the Western Pacific Railroad Company, and the Central Pacific Railroad Company of California, and to provide for the

payment of the same, and other matters relating thereto."
(Statutes of 1863, p. 380.)

The charge that this Act is unconstitutional is founded
upon certain provisions contained in the seventeenth section,
which reads as follows :

" SEC. 17.    The subscriptions of stock authorized by the
provisions of this Act shall be made by said Board of Super-
visors on the books of each of said companies, upon the
express condition that the said city and county shall not be
liable for any of the debts or liabilities of either of said com-
panies beyond the amount so subscribed; and this provision
as to the liability of said city and county shall· be a part of
and so expressly stipulated in all contracts made by said com-
panies for the construction and equipment of said roads ; and,
in case either of said companies shall fail or refuse to make
such stipulation in all of their said contracts, then the said
Board of Supervisors shall have power to declare the said
subscription to the capital stock of such company void and of
no effect, and may recover of said company any previous pay-
ments that may have been made thereon at the time of such
failure or refusal, and the said city and county shall never
make any other or further subscription to the capital stock of
said companies, or either of them, than that provided for by
this Act."

It is claimed by counsel for appellant that the foregoing
section exempts the City and County of San Francisco from all
liability for the debts and other liabilities of the railroad cor-
porations mentioned in the Act, and is therefore in direct con-
flict with the thirty-sixth section of Article IV of the Consti-
tution.    And it is further contended that the provisions of the
section in question are so interwoven and interblended with
the whole scope and purpose of the Act as to entirely vitiate
the same and render it unconstitutional and void.

I.    There are two sections (thirty-two and thirty-six) in the
fourth Article of the Constitution touching the individual and

personal liability of members of a corporation, between which there is an apparent repugnancy.   They provide as follows :

" SEC. 32.   Dues from corporations shall be secured by such individual liability of the corporators and other means as may be prescribed by law."

" SEC. 36.   Each stockholder of a corporation or joint stock association shall be individually and personally liable for his *proportion* of all its debts and liabilities."

The first is a positive injunction requiring the legislative department of the Government to provide security for corporate dues, by laws imposing, in connection with other means, some degree of individual liability upon the members of the corporation, but leaving the extent of that liability to the wisdom and sound discretion of that department.   But the latter section, by itself considered, seems to fix, upon first impression, the precise degree of liability, leaving no room for the exercise of legislative judgment.   To harmonize these apparently conflicting provisions, or, if the conflict is irreconcilable, to determine which is to furnish the rule of conduct, is the office of judicial construction.

Constitutions, like statutes and private instruments, must be so construed, if possible, as to give some force and effect to each of their provisions.   The legal intendment is that each and every clause has been inserted for some useful purpose, and when rightly understood may have some practical operation.   For the purpose of harmonizing apparently conflicting clauses, each must be read with direct reference to every other which relates to the same subject, and so read, if possible, as to avoid repugnancy.   And, to that end, sections, paragraphs, and sentences may be transposed ; elegance of composition may be sacrificed ; and the meaning of words and phrases may be restricted or enlarged.

If we read the thirty-sixth section as imposing a liability separate and distinct from that imposed by the thirty-second section, it is clear that the latter has no office to perform, and is, in effect, stricken from the Constitution.   This result, how-

ever, must be avoided, if possible, and some practical opera-
tion accorded to the latter section. And this may be done, if
it appear, upon a careful examination, that the thirty-sixth
section, when considered by itself or with the aid of some
established rule of the common law, is not complete or self-
executing, or, in other words, does not, within its own terms,
provide a complete rule of conduct, and such defect is not
cured by any rule of common law. If such be the case, the
power of supplying the needed element exists in the legisla-
tive department, and its exercise is enjoined by the provisions
of the thirty-second section. Is the thirty-sixth section, then,
complete in itself? Is it self-executing, and does it contain
within its own terms, aided or unaided by the established
rules of the common law, a complete rule of conduct broad
enough to embrace and definitely settle, in all its relations,
every question that may arise touching the individual and per-
sonal liability which it imposes upon stockholders?

That it does not contain such a rule in its own terms is man-
ifest. It declares that each stockholder of a corporation or
joint stock association shall be individually and personally lia-
ble for his proportion of all its debts and liabilities, but does
not determine what that proportion shall be, nor does it pre-
scribe any rule by which it shall be ascertained. Is this man-
ifest omission supplied by any established rule of common law?
If so, it may be intended that the section was framed with
direct reference to such rule, and that in legal contemplation
such rule was impliedly incorporated in the section, with the
same force and effect as if expressed in terms.

At common law no individual liability is imposed upon the
members of a corporation, and there is therefore no depart-
ment of the common law to which we can look for such a
rule, except that which relates to partnerships or associations
formed for trading purposes. Upon examination it will be
found that that fountain fails to supply the needed element.
By the law of partnership each member, as to third persons,
is jointly and severally liable for the full amount of the liabili-
ties of the firm. As between themselves, each one's propor-

tion of liability may or may not be regulated by private agreement. In the absence of any such agreement they are bound to share the burden equally, and the right to contribution exists. It will not do, therefore, to say that the section in question has adopted the common law rule of partnership liability and extended it to stockholders of a corporation, because that proves too much, and carries us beyond the express terms of the section. Whatever be the extent of the liability, and by whatever rule it is to be ascertained, it is clear, from the terms used, that it was not the intention of the framers of the Constitution to impose upon the stockholders of a corporation a liability co-extensive with that of co-partners at common law. The liability is not joint and several, but is individual and personal, without any right to contribution, and is not for the whole amount of the debt, but is for some indeterminate proportion. So much is clear from the language itself, without foreign aid. From what has been said, it would seem that the thirty-sixth section does not contain a complete and obviously perfect rule of liability, and cannot therefore be held to be self-executing; and it would further seem that the missing quantities, necessary to make it such, cannot be drawn from the common law.

But it may be said that if the rules of law fail to cure the defect or supply the missing quantities, we are at liberty to invoke the aid of some other science. Admitting, for the sake of argument, that the law fails to supply rules sufficient for the just interpretation of legal instruments, and that a resort, if necessary, may be had elsewhere, is there any other branch of learning whose rules are sufficient to enable us to determine with certainty the precise signification intended to be given to the word *proportion*, as used in the Constitution. In this view there is no promise of aid except it be found in the science of mathematics. Conceding, then, that a mathematical proportion is intended, are all the difficulties in the path of the self-acting theory removed? Once in the field of mathematics, we are confronted with a complete array of proportions—arithmetical and geometrical, direct, inverse, and

reciprocal, and perhaps many others which neither the bench nor the bar are bound to know. How are we to determine which of these numerous proportions is intended? But assuming, as it may be claimed we ought to do, that the simplest form of proportion is intended, we may be said to have three quantities given by which to find a fourth, the given quantities being the capital stock of the corporation, the stock of the individual stockholder, and the liability of the corporation; the fourth, or one to be found, being the liability of the stockholder. Stated in mathematical form it would read as follows: As the corporate stock is to the individual stock, so is the corporate liability to the individual liability. Substitute this language for the word "proportion," and is all that was wanting to make the section self-executing supplied? Have we now language broad enough to embrace and definitively settle every question which may arise touching the individual liability of a stockholder, or is there still an element wanting? The rule would be sufficiently comprehensive and explicit if the given quantities always remained the same. But suppose A., being a stockholder, sells to B., does the existing liability follow the stock and impose itself as a burden upon the shoulders of B., or does it follow the person and still cling to the skirts of A.? Or does it divide itself, and one moiety remain with A. and the other follow B.? Or does it multiply itself by the number of individuals into whose hands it may come, and attach an aliquot part of the last multiple to each? For the solutions of these various questions even the science of mathematics, whose aid we have invoked for the purpose of upholding, if possible, the self-acting theory, manifestly furnishes no rules.

In order to render the thirty-sixth section self-executing, that is to say, operative without the aid of legislation, it should define what the proportion of the stockholder's liability shall be, and provide whether it shall embrace all the corporate debts and liabilities, past, present, and future, or be restricted to such debts and liabilities as are created or incurred during the time that he is a stockholder. If it be said that these missing quantities, if necessary to give operative effect, may

be engrafted on the section by construction, the answer is, that if such a proceeding is permitted at all by the rules of construction, it is for the purpose of reconciling apparent conflict, and not for the purpose of promoting it.

From what has been said, it results that the thirty-sixth section of the Constitution, even when aided by the rules of law and mathematics, does not make a complete rule broad enough in its terms to embrace and definitively settle all the conditions upon which the liability of the stockholder must rest; and, as a corollary, it further results that legislation is necessary to give it a reasonable and practicable operation. And such seems to have been the conclusion to which the Legislature has arrived.

The thirty-second section of the Act concerning corporations, passed in 1850, (Wood's Digest, 115,) provides that " each stockholder of any corporation shall be individually and personally liable for a portion of all its debts and liabilities proportioned to the amount of stock owned by him." Here the word " proportion," as used in the Constitution, is to a certain extent defined, and declared to be a mathematical proportion. But this enactment was insufficient to give a reasonable and practicable operation to the thirty-sixth section, as we have already seen. This truth seems to have been discovered by the Legislature, for in 1853 they passed another Act concerning incorporations, in which we find the following section :

" Sec. 16.    Each stockholder shall be individually and personally liable for his proportion of all the debts and liabilities of the company *contracted or incurred during the time that he was a stockholder.* For the recovery of which joint or several actions may be instituted and prosecuted."

It is true that the Legislature, in supplying what was needed and omitted from the Act of 1850, left out the provision of that Act which defines the word " proportion ;" yet, although neither by itself affords a perfect rule, the two com-

bined ·contain what is omitted in the thirty-sixth section of the Constitution and is needed to give it a practical operation.

If we read the thirty-sixth section in the manner suggested it is made to harmonize with the thirty-second, and each is made to serve a useful purpose, and neither is allowed to sacrifice the other.

Such seems to us to be the reasonable and proper construction to be given to the thirty-sixth and thirty-second sections of the Constitution. By such reading harmony is preserved and some force and effect is given to each. Any other reading must manifestly sacrifice one section to the ambition of the other, and practically strike it from the Constitution.

Under this construction, the Legislature has the power to say, not that the stockholder shall not be liable for any of the debts of the corporation, but that he shall be liable for his *portion*, and to say what that portion shall be. Thus the Constitution is made to say to the legislative department of the Government, the stockholder shall be individually and personally liable for his proportion of the debts and liabilities of the corporation, but to your wisdom and sound discretion is intrusted the power to adjust the mode and measure of the liability. It is the duty of the Legislature to carry out this provision according to its spirit, and to fix the liability of the stockholder at a figure adequate to guard effectually against the evils for which the Constitution seeks, through the co-operation of the Legislature, to provide a remedy.

But the exercise of this power is subject to the rule that " all laws of a general nature shall have a uniform operation," as provided in section eleven of Article I of the Constitution, and the same rule of liability must be imposed upon all stockholders of corporations and joint stock associations. The Constitution knows no distinction between persons, and the Legislature cannot discriminate, or grant an indulgence to one which is not accorded to another. Every general law must have a uniform operation; that is to say, it must operate equally on all persons and upon all things upon which it acts at all.

Where, under the Constitution, a law must impose some indeterminate liability upon a class of persons, as, for example, stockholders of a corporation, it must impose the liability, at whatever rate it may be fixed, upon all alike, and cannot exempt one any more than it can exempt all; nor can it attach a lower rate of liability to one than it does to another; nor can it attach a greater or less liability to the stockholders of one corporation than it does to the stockholders of another.

If it be said, that by reason of the construction which we have given the thirty-second and thirty-sixth sections of the Constitution, the Legislature are enabled to defeat the purpose of the Constitution by non-action, the answer is, that by the same non-action they would defeat the creation of corporations as contemplated and authorized by the Constitution. The individual liability of the stockholder is a constituent element in the artificial life of a corporation, made so by the author of its creation, and that life can no more exist under the Constitution without the element, than a natural person can exist when deprived of an element made indispensable to his existence by the laws of nature. Hence, an Act of the Legislature authorizing the formation of corporations without attaching to the corporators an individual liability, would be as obnoxious to the Constitution as would be the creation of a corporation by special Act; and the Courts would be bound to hold that persons organized under such an Act had acquired none of the rights of a corporation. And it may be further answered, that the adoption of a Constitution is but the initiatory step toward the organization of a Government, and its whole purpose may be defeated by a failure on the part of the people to organize the various departments of Government pursuant to its provisions, or by a failure of either of the departments, when organized, to perform its allotted functions pursuant to the behests of the Constitution. For such consequences there is no remedy except in the good sense of mankind. The argument proves too much, and carries with it the germ of its own refutation.

II. It is apparent that the construction which we have given

69

to the thirty-second and thirty-sixth sections of Article IV of the Constitution does not materially aid us in the solution of the difficulties involved in the present case. If the Act in question, upon a fair and reasonable construction of the terms of the seventeenth section, does exempt the city and county of San Francisco from all liability for the debts and liabilities of the corporations therein named, as is claimed by counsel for appellant, it is in direct conflict with the Constitution as we have interpreted it. It is not only in conflict with the thirty-second and thirty-sixth sections of Article IV, but, as we have already intimated, with section eleven of Article I. And if this be so, we are bound to declare the whole Act unconstitutional, unless, as is claimed by respondents, the seventeenth section is an independent provision, not entering into the general object and purpose of the Act, and may, therefore, be stricken out without prejudice to the general design and intent of the Legislature.

Hence, two questions are presented : First—If unconstitutional, is the seventeenth section so intimately connected and interwoven with the other provisions of the Act that we cannot intend that the Legislature would have passed the Act with the seventeenth section left out ? Second—Is the seventeenth section, upon a fair and reasonable construction of its terms, made in conformity with the established rules of interpretation, in clear and manifest conflict with any provision of the Constitution ?

1. In *Robinson* v. *Bidwell*, 22 Cal. 379, a statute similar to the present came before the late Supreme Court for construction. The section of that statute which was claimed to be obnoxious to constitutional objection, if unconstitutional, was more clearly so than the one now under consideration, but bore the same relations to the other provisions of the Act. The Court, however, held that it was an independent provision, and not, in its nature and connections, essential to the law, and, therefore, admitting it to be vicious, it might be treated as a nullity, leaving the rest of the statute to stand as valid.

The correctness of that conclusion has been directly assailed by counsel for appellant.

Necessarily, no precise rules can be found by which a Court can determine questions of this character. Whenever a question of this kind arises, its solution must be worked out by a patient comparison of the suspected provision with all others contained in the Act, keeping in constant view the main design and scope of the law, unaided, from the very nature of the case, by any rules of construction except such as are of the most vague and general import. Hence, it is no impeachment of each other's legal acumen if different Judges arrive at opposite conclusions upon such a question, in a case of nice discrimination.

In *Lathrop* v. *Mills et al.*, 19 Cal. 529, Mr. Justice Baldwin said : " It is true that the Constitution merely interdicts Acts which oppose its provisions, and that if in any Act there be found a provision which is constitutional, that provision may be carried out, provided the excepted provision is *entirely disconnected* from the vitious portions of the Act; and the Legislature is presumed to intend that, notwithstanding the invalidity of the other parts of the Act, still, this particular section shall stand. The saving of the particular provision, even when not upon its face unconstitutional, in such instances is a matter of legislative intent. In order to sustain the excepted clause, we must intend that the Legislature, knowing that the other provisions of the statute would fall, still willed that this particular section should stand as the law of the land."

In *Warren et al.* v. *Mayor of Charlestown*, 2 Gray, 98, the learned Chief Justice Shaw said : " It is no doubt true, as has been argued by the learned counsel for the prosecutors of this writ, that the same Act of legislation may be unconstitutional in some of its provisions, and yet constitutional in others. * * * Such Act has all the forms of law, and has been passed and sanctioned by the duly constituted legislative department of the Government, and, if any part is unconstitutional, it is because it is not within the scope of legiti-

mate legislative authority to pass it.   Yet, other parts of the same Act may not be obnoxious to the same objection, and, therefore, have the full force of law, in the same manner as if these several enactments had been made by different statutes.   But this must be taken with this limitation, that the parts so held respectively constitutional and unconstitutional, must be wholly independent of each other.   But, if they are so mutually connected with and dependant on each other, as conditions, considerations, or compensations for each other, as to warrant a belief that the Legislature intended them as a whole, and that, if all could not be carried into effect, the Legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected, must fall with them."

By the light of these general rules the Act in question must be examined, and the dependence or independence of the seventeenth section determined.   Viewing the Act as a whole, we find it is a grant of power to the City and County of San Francisco, a municipal corporation, and may be regarded as a last chapter in its charter, conferring powers not before possessed, and which cannot be conferred except by grant from the sovereign power, of which the City and County of San Francisco is itself a creature.   The Act is divided into eighteen sections.

The first provides for the submission of two propositions to the qualified voters of the city and county, for the Board of Supervisors to take and subscribe certain amounts to the capital stock of the two railroad companies therein named.

The second provides for the publication of a notice stating the character of the propositions to be submitted; prescribes the manner of voting, and how the votes shall be canvassed; requires the Board to meet to count the votes and declare the result; and, if the result be in favor of the propositions thus submitted, to meet as a Board *for the purpose of "perfecting the subscriptions of stock as hereinafter provided."*

The third directs the Board to take and subscribe the stock

thus authorized to be subscribed, in the name of the city and county, and "to pledge the faith and credit of the city and county for the payment of the same, *in the manner hereinafter provided.*"

The fourth prescribes by whom the subscriptions shall be made, and that they shall be made upon the condition that they shall be paid in the *bonds* of the city and county, *and not otherwise,* and that the same shall be received *at par, dollar for dollar.*

Sections five and six provide for the issuing and paying over the bonds.

The seventh provides that the bonds, and an equal amount of other funds, shall be expended by the respective companies, from time to time as the bonds are issued, in the actual construction of their roads; and in the event of their failure to do so, authorizes the Board to withhold subsequent payments, and in its discretion to declare the subscriptions void; and in such event to sue and recover back payments already made.

The eighth, ninth, tenth, eleventh, twelfth, and thirteenth, provide the ways and means, and the mode and manner of raising and disbursing the same.

The fourteenth provides the liability and compensation of the officers appointed to supervise the matter.

The fifteenth and sixteenth provide the powers of the Board as stockholders, and other matters not material to mention.

The seventeenth, and suspected section, prescribes the manner and addititional conditions upon which the subscriptions are to be made, and imposes upon the companies the penalties for a violation of those conditions.

The eighteenth and last declares the Act to be a public Act.

We have thus given a brief synopsis of the various provisions of the Act, in order that the leading features or ideas of the law may be brought into close proximity.

The City and County of San Francisco, being a municipal

corporation, had no power to subscribe to the stock of a railroad or other private corporation. It had, therefore, to resort to the Legislature to get that power; and it was granted upon such terms and conditions, and under such restrictions, as were suggested by the wisdom of that body. The Legislature had the power to give or refuse, to grant absolutely or conditionally. The petition of the city and county was, to be allowed to subscribe to the capital stock of the railroad corporations named in the Act. The Legislature responded : You may do so upon certain terms and conditions, which must be strictly observed. Such, by legal intendment, is always the language of legislative grants of corporate power, and the exercise of such power must be enjoyed in the mode and manner and upon the conditions prescribed in the grant.

In the case of *Zottman* v. *The City and County of San Francisco*, 20 Cal. 102, Mr. Chief Justice Field said : " The rule is general, and applies to the corporate authorities of all municipal bodies; where the mode in which their power on any given subject can be exercised is prescribed by their charter, the mode must be followed; the mode in such cases constitutes the measure of the power * * *. Aside from the mode designated, there is a want of all power on the subject. This is too obvious to require argument, and so are all the adjudications. Thus, in *Head* v. *The Providence Insurance Co.*, 2 Cranch, 156, Mr. Chief Justice Marshall, in speaking of bodies which have only a legal existence, says : ' The Act of incorporation is to them an enabling Act; it gives to them all the power they possess ; it enables them to contract, and when it prescribes to them a mode of contracting, they must observe the mode, *or the instrument no more creates a contract than if the body had never been incorporated.*' "

In *The Farmers' Loan and Trust Co.* v. *Carroll*, 5 Barb. 613, the Supreme Court of New York said : " Where a corporation relies upon a grant of power from the Legislature for authority to do an act, it is as much restricted to the mode prescribed by the statutes for its exercise as to the thing allowed to be done."

If the law governing the exercise of corporate powers be correctly stated in the foregoing cases—of which there can be no question ; if the mode of its exercise is the measure of the power, as stated by Mr. Chief Justice Field; or if, in cases of contract, as stated by Mr. Chief Justice Marshall, the mode prescribed must be strictly observed, or the contract is a nullity ; or if, as stated by the Supreme Court of New York, the corporation is as much restricted to the mode prescribed as it is to the thing to be done, it follows that the mode enters into the essence, so to speak, and becomes a constituent element of the power itself, resulting in a single entity.   Applying these principles to the case in hand, we find that the City and County of San Francisco is empowered to tender to the railroad corporations, and, if agreed to by them, to enter into a contract already drafted and engrossed by the Legislature, without any power on the part of either of the contracting parties to change or modify it in any particular.  The contract contains the power and the mode ; both are of the substance, and neither can be departed from without nullification.  Can it be said, in view of the law of corporate power and the provisions of this Act, that the Board of Supervisors can subscribe the specified amount of stock in the name of the city and county, and pledge its credit in payment thereof, without first submitting the proposition to a vote of the people ?  Can it be said that the Board may make the subscription without stipulating that the same shall be paid in the bonds of the city and county *at par*, dollar for dollar ? Or without stipulating that the bonds and an equal amount of other funds shall be used in the actual construction of the roads, under penalty of forfeiture and recovery ?  Or without stipulating for the exemptions from individual liability, as provided in the seventeenth section ?  The same reasoning which would declare the latter provision independent and not essential to the complete execution of the legislative intent, would erect each of the preceding provisions into independent propositions, wholly useless to what *Robinson* v. *Bidwell* calls the leading design of the law ; and thus, by the hand of judicial construction, one

by one, every provision of the statute, wisely intended by the Legislature for the security and protection of the city and county, may be plucked from the body of the Act. Such a sweeping slaughter of paragraphs and sections strips the Legislature of all its conservative power. Under such a doctrine the Legislature may dispense power, but it cannot direct or control its exercise. Thus, a corporation, once vested with power, becomes sovereign as to its exercise, and may set at defiance the behests of the Legislature.

Such, we think, are some of the legitimate fruits of the construction contended for by respondents. But, independent of the foregoing considerations, the Act in question bears upon its face evidence sufficient to establish the dependent condition of its various provisions, and prove beyond question that they are but parts of a single and complete design. In *Robinson* v. *Bidwell* the scope and object of a similar statute was declared to be " to authorize the City and County of Sacramento to subscribe for stock of the railroad company, and to provide for the payment of the same." (22 Cal. 387.) This statement of the main design of the Act is too broad for logical purposes, and it is, by reason of its generality, deceptive. It implies a grant of *unlimited* power to subscribe; whereas, it is a grant of *restricted* power. It is not a grant of power to subscribe and provide the means of payment, but to subscribe in a particular mode and upon express conditions, and to provide means in a way expressly pointed out. The leading design of the Act is not to grant a power of *absolute*, but *conditional* subscription. Thus viewed, each condition is not a mere incident, or something aside from the purpose, but enters into the main design, and becomes indispensable to its achievement. Thus, the mode of subscription, in the language of Mr. Chief Justice Field, in *Zottman* v. *The City and County of San Francisco*, is made the measure of the power to subscribe, and the mode of payment is made the measure of the power to pay.

It is also worthy of remark that the expressions " as hereinbefore provided," " as herein provided," and " as herein-

after provided," are of frequent occurrence throughout the body of the Act. Such expressions are connecting links which bind a statute together, and establish in a measure the dependent relation of its several parts. By some of these expressions the seventeenth section only, as appears from the general context, is referred to.

In view of the foregoing considerations, with all due deference to the acknowledged learning and ability of our immediate predecessors, we are forced to the conclusion that the seventeenth section is not an independent provision, and that it cannot be left out without doing violence to the legislative intent; nor can we, under the rules of legal construction, intend that the Legislature would have passed the Act, had they known that the seventeenth section could have no legal effect. We are, therefore, of the opinion that the seventeenth section, if it must fall by reason of its alleged repugnancy to the Constitution, is so interblended with the main designs of the Act as to vitiate the whole.

2. We have now to determine what is the proper and legal construction of the seventeenth section of the Act. If that section is to be read as exempting the City and County of San Francisco from all liability to *third persons* for the debts and liabilities of the corporations named in the Act, we must, in accordance with the views already expressed, hold that it is unconstitutional and that the whole Act must fall with it.

To construe a statute, is to search after the legislative intent as expressed in the language of the statute. "The end of construction is to find what was the intent and meaning, and to clear up that meaning, when obscure; to ascertain the sense of ambiguous words; to determine the design when imperfectly expressed." (Smith's Commentaries, 692.) The search, if need be, must not be confined to the doubtful passages or words, but may be extended to every provision of the Act. In interpreting the letter of the statute, punctuation may be entirely disregarded, and the rules of grammar need not be strictly followed. *Mala grammatica non vitiat chartam.* But the search need not be confined to the letter

70

of the statute.  The law looks to the substance and not the form.  *Quæ hæret in litera hæret in cortice.*  The whole scope and design of the statute is to be studied, and its language is to be so construed as to aid that design, and not to defeat it.  Particular sentences are not always so framed as to express clearly the legislative intent; yet, if that intent can be gathered from the immediate context, or from the general scope and purpose of the Act, such sentence is to be so construed, if possible, as to harmonize with it.  If a particular construction has the effect to declare the Act or any part of it unconstitutional, such construction must be avoided, when it can be fairly done, for the legal presumption is that the Legislature could not have so intended.  This, however, is to be taken with the qualification that where the language used is unambiguous, and the meaning clear and obvious, an unconstitutional consequence cannot be avoided by forcing upon it a meaning, however plausible it may be, which is, upon a fair test, repugnant to its terms.  But if the language upon its face is ambiguous and susceptible of different constructions, it may be forced, so to speak, to the extent of adopting the less obvious construction, in order to uphold the law.  All doubts are to be resolved in favor of and not against the validity of the statute.

Upon a careful examination of the language of the statute, we are satisfied that it was not the intent of the Legislature to exempt the City and County of San Francisco from liability for the debts and liabilities of the railroad companies; but that, with a full and perfect knowledge of its inability to do so, it has sought, so far as possible under the provisions of the Constitution, to guard the city and county against the consequences of that liability.  This the Legislature proposes to do by acting directly upon the railroad companies, and interposing them, so far as the circumstances of the case will permit, between the city and county and the creditors and claimants of the corporations.  And that, so far as the measures adopted to that end could effect it the Legislature has intended to go, and no further.  There is but a single

expression in the whole Act which, even apparently, runs counter to this theory, while it is upheld by all the other language of the statute, together with its general scope and design. To what extent the measures adopted may prove effectual is a matter of no consequence here. If none of them are obnoxious to constitutional objection, that is sufficient for the purposes of the present case. Should they prove wholly inconsequential, such a result could have no effect upon the validity or invalidity of the Act. Nor is it of any consequence whether the voters of the city and county would have sanctioned the law had they understood it as we are now interpreting it. Upon this point, Mr. Justice Norton, in *Robinson* v. *Bidwell*, well said : " Whether they would or not, is, however, purely a matter of conjecture ; and, besides, it is immaterial, because their vote was not the act of legislation. It is precisely because this vote is not itself the enactment of the law which relieves the Act from the objection that the Legislature cannot delegate its powers directly to the voters. The result of this vote is only the contingency upon which the Legislature have expressed their will that the law shall take effect. The event has occurred, and the law, so far as it was dependent upon this event, takes effect, because the Legislature has enacted that it should take effect on the happening of that event. The result of the vote is a fact the effect of which cannot be varied by any speculations as to what it might have been."

The language which, as is claimed, exempts the city and county from liability is as follows : " The subscriptions of stock authorized by virtue of the provisions of this Act shall be made by said Board of Supervisors on the books of each of said companies upon the express condition that the said city and county shall not be liable for any of the debts or liabilities of either of said companies beyond the amount so subscribed and this provision as to the liability of said city and county shall be a part of and so expressly stipulated in all contracts made by said companies for the construction and equipment of said roads."

Statutes are to be read without breaks or stops, and we have therefore omitted the punctuation. The foregoing is but one clause, and has but one subject, viz: exemption from personal liability. In order to get its full meaning, we read all that is said upon that subject, aided by the legal presumption that no word is idle or useless, and that each has its office to perform in giving expression to the legislative intent; and aided, also, by the presumption that the Legislature does not intend to do an unconstitutional act; and not forgetting that the less obvious construction, in cases of doubt, may be adopted in order to uphold the law.

It is conducive to correct results for Judges, when called upon to construe a statute, to place themselves so far as possible in the position of the Legislature, and assuming each adversary theory in turn, attempt to give it expression as near as may be in the language of the Legislature, not forgetting the established rules of construction already suggested. Assuming, then, that the Legislature has the power to exempt the City and County of San Francisco from all liability of every character and kind, past, present, and future, and desires and intends to exercise that power, we find that full, clear, and complete expression of such intent is contained in the following words: " * * * the said city and county shall not be liable for any of the debts or liabilities of either of said companies beyond the amount so subscribed." If such was the intent, it is obvious that language more natural and apt could not be found. But, assuming such to be the intent, it is equally obvious that one of the most persistent rules of construction is grossly violated, for more than half the language used to express that intent is made entirely useless. The language used assumes the power, and declares the intent in broad and general terms, yet so clear and explicit that no doubt can attach itself to the meaning, and construction has no duty to perform. But these words do not stand alone; they are accompanied by others, to which meaning must also be allowed: " * * * and this provision as to the liability of said city and county shall be a part of and so expressly stipulated

in all contracts made by said companies for the construction
and equipment of said roads." These two clauses contain all
that the Legislature has said upon the subject. Considered
separately, it is manifest that each clause has a theory which
is consistent with itself, but each theory is inconsistent with
the other. The first clause proceeds upon the theory that the
Legislature has the power to exempt the city and county from
liability; the second proceeds upon the theory that the Legis-
lature has not the power, but that each of the companies has,
and that it lies in contract. This theory, of course, involves
the doctrine of waiver, but of that, we shall speak hereafter.
If the first theory is to prevail, the Act is thereby made uncon-
stitutional, which, as we have already seen, is to be avoided,
if possible. If, however, its general words may be restricted
so as to harmonize with the latter theory, the Act may be
upheld, if the doctrine of waiver, upon which it is founded,
is not itself repugnant to the Constitution. We think that
even under the strictest rules of construction these seemingly
independent clauses are to be regarded as one, and as expressing
but one intent. The more general words are qualified and lim-
ited by those which follow, and give a narrower scope to the
legislative intent. The words "not any," used in the former
part of the clause, are equivalent to the word "all," and the
clause may be read in the following manner: "The city and
county shall be exempt from liability on all contracts made and
liabilities incurred by said companies beyond the amount so
subscribed, and this provision shall be a part of and expressly
stipulated in all contracts for the construction and equipment
of said roads." Thus read, the meaning of the words "not
any" or "all," are qualified by what follows, and their mean-
ing confined to the character or class of liabilities specifically
named. In this manner a meaning is given to the whole,
which leaves no part of the language useless, and is not repug-
nant to the Constitution, unless, as we have before stated, the
doctrine of waiver is to be so held. This reading, if not the
most obvious, when merely the words and punctuation are
considered, is reasonable, and in harmony with the doctrine of

waiver, the application of which to the case in hand was, in our judgment, the leading intent of the Legislature. In speaking of the signification of such words as "not any" and "all," in *Phillips* v. *The State ex rel. Saunders and another*, 15 Geo. 518, the Supreme Court of Georgia said: "True, it (the statute) says that in *all* cases where a levy is made, etc. One is amazed, in casting a glance over our statute book, to find how often this form of expression occurs—frequently signifying, as here, not absolutely all, but all of a *particular class* only. Indeed, it seems to be common to all writings—lay as well as legal, sacred as well as profane—and the generality of the phrase is frequently to be restrained in an Act, not only by the context, but by the general form and scheme of the statute, as demonstrative of the intention of the Legislature."

And so in *The City of Covington* v. *McNickel's Heirs*, 18 B. Monroe, 286, say the Court of Appeals of Kentucky: "A well known rule for the construction of statutes—which, though ancient, is always adhered to—is that the general words in one clause of a statute may be restrained by the particular words in a subsequent clause of the same statute." (See, also, Dwarris on Statutes; 765.) This rule finds a familiar illustration in the construction of powers of attorney, where the more general terms used in the commencement are always held to be restrained by the subsequent and more particular specifications.

We are therefore of the opinion that the seventeenth section does not, upon a legal construction of its terms, necessarily exempt the city and county from liability further than such exemption can be secured by express contracts of waiver; and this brings us to the last question involved in this case.

III. The construction which we have given to the thirty-second and thirty-sixth sections of Article IV of the Constitution destroys the force of the able argument made by the learned counsel for the appellant against the doctrine of waiver, so far as that argument is founded upon grounds of public policy predicated of the Constitution. If the extent of the personal liability of the stockholder is mainly left, as we

hold, to the wisdom and discretion of the Legislature, the doctrine that some great end of public policy is to be subserved by constitutional inhibition is greatly weakened if not entirely destroyed.   But whether it be regarded as a constitutional policy or not, we are unable to see how, although it rests upon a surer foundation, it is better sustained by sound reason and principle than it is when considered as the offspring of statutory regulation.   A question of public policy is but a question of public policy, from whatever source it may take its origin; and whether it is such or not is to be ascertained by the same general rules.   How the individual liability of a stockholder of a corporation can be a matter of public concern any more than the liability of a co-partner, we are unable to perceive; and we are not aware that it has ever been claimed that the latter liability has its foundation in public policy.   It is merely a liability created by law, as it might be by contract, and is intended only for the benefit of those who may deal with corporations.   It is but another fund to which the creditor may look when the social fund has been exhausted, and whether he chooses to look to it or not is a matter of no concern to the public.   If the thirty-sixth section of Article IV of the Constitution establishes a policy which none, not even the party directly concerned, can contravene or waive, and by which we are all bound, *nolens volens,* so does that clause of the Constitution which secures to all the right of a trial by jury; and the same may be said of the clause designed to secure a homestead to each head of a family.   Nor is there a clause of constitutional or statutory law of which the same might not with equal reason be predicated.

There being, then, only a question of private right involved, there can be no question but that the party interested in the enforcement of that right may contract to waive it.   Upon this question Mr. Sedgwick says: "The general rule holds good, as well in regard to Constitutions as to statutes.   A party may waive a constitutional as well as a statutory provision made for his benefit.   So it has been repeatedly decided that a party may waive the right to a trial by jury, although that mode of

proceeding be guaranteed to him by the Constitution. So, if a private road is laid out in an unconstitutional manner, if the owner consent, the proceeding will be held valid. It is on this same doctrine of waiver that it has been frequently held that the acts of a public officer exceeding his legal authority may be adopted by the party for whose benefit the illegal act is done. So where a Sheriff had arrested a defendant on a *ca. sa.*, and discharged the debtor on receiving his promissory note; though the act of the Sheriff was illegal and the note void in his hands, it was held that the plaintiff might affirm the Sheriff's act and claim the note." (Sedgwick on Constitutional and Statutory Law, 111.) If public policy can be predicated of the constitutional liability of a stockholder of a corporation *a fortiori* it may of the constitutional homestead right, and yet, can it be pretended that the homestead right may not be waived and the property voluntarily surrendered for the benefit of creditors? We think the liability in question may be waived by express contract without the violation of any principle of public policy or constitutional law.

Our conclusions are that the thirty-sixth section of Article IV of the Constitution is not self-executing, and that therefore the Legislature may constitutionally say what shall be the extent of the individual liability of a stockholder of a corporation or joint stock association. Second, that the provisions of the seventeeth section of the Act in question, providing indemnity against constitutional liability, are not independent provisions which may be disregarded, but that there is nothing in those provisions, when legally construed, which is obnoxious to constitutional objection.

Judgment affirmed.

SAWYER, J., concurring specially :

I concur in the judgment, for the reasons, among others, stated in subdivision "2" of the second point, and in the third point of the opinion of the Chief Justice, without expressing any opinion upon the other questions discussed.